Nancy **PIZZUTO**, Plaintiff,

v.

**PERDUE INCORPORATED**, Defendant.

Civ. A. No. 84–482 LON.

United States District Court,
D. Delaware.

Dec. 16, 1985.

---

Edward C. Gill of Robert C. Wolhar, Jr. & Associates, Georgetown, Del., for plaintiff.

J. Robert Hitchens of Georgetown, Del. (Charles P. Roberts III of Haynsworth, Baldwin, Miles, Johnson, Greaves & Edwards, Greenville, S.C., of counsel), for defendant.

## OPINION

LONGOBARDI, District Judge.

The Plaintiff, Nancy Pizzuto, alleges the Defendant, Perdue, Incorporated, fired her from her job as a security guard because she is a woman. What follows are the Court's findings of facts, conclusions of law and final decision based on the trial of the issues.

Before being employed by Perdue, the Plaintiff was employed as a security guard at Delaware Technical and Community College in Georgetown, Delaware. Her immediate supervisor knew Dennis Johnson, the

head of security at the Perdue Georgetown plant, and the two frequently met at the school where they engaged in ping pong games. The Plaintiff requested her supervisor to intervene with Johnson to help her obtain a part-time security guard job at Perdue. He did and, after some period of time, a vacancy occurred and Johnson spoke to Plaintiff about her interest in the job. Satisfied that she would make a suitable guard, Johnson personally delivered her an employment application form and, when she had completed it, personally took it from her. He arranged a meeting with the personnel supervisor at the plant and attended her interview. After she was hired, Johnson asked her what shift she wanted and, to accommodate her, gave her a shift that would not conflict with her job at the school.

On August 5, 1983, the Plaintiff was assigned a post at the gate house at the Perdue plant entrance. With her that evening were Douglas Niblett and Paul Long, two other security guards. Niblett, suffering from an injury, was assigned to the desk and phone and Plaintiff and Long were assigned, among other things, to checking the incoming and outgoing traffic. It was in this function that the Plaintiff provided the basis which Perdue insists was the reason for her discharge. At about 9:45 p.m., a loaded trailer leaving the plant stopped for inspection. It was the duty of the guard or guards on duty to check refrigeration seals and to check shipping manifests against the particular trailer to determine whether the proper trailer was in tow. If, for instance, the manifest, shipping papers for a particular loaded trailer, did not match the trailer that was in fact in tow, a customer as far away as New York or Massachusetts would receive the wrong load. As the Plaintiff was approaching the gate house from a round of inspection elsewhere on the plant grounds, a loaded trailer stopped at the gate. While Long read aloud to Niblett the trailer number, Plaintiff took the shipping manifest papers from the driver and performed the other required tasks. From the manifest, Plaintiff recorded the trailer number as 2002. When Niblett advised her that Paul Long had said the trailer number was 2005, Plaintiff told him that she was right and to put down 2002. Confronted by the discrepancy, Long said "I'm not sure." At this critical moment, it was apparent that one of the two guards had erred but none of the three guards took the responsibility to prevent an expensive and time-consuming mistake. As the loaded truck left the gate house and proceeded seventy-five yards away to be weighed, the Plaintiff, Niblett and Long had a discussion about who was right and who was wrong. As subsequent events would reveal, Plaintiff had made the mistake and, in her own words, said, "[s]o, it was my fault...." Plaintiff's Deposition, Docket Item ("D.I.") 10, p. 51. Plaintiff then proceeded to complete her log of activities from her previous tour of inspection and the wrong load of chickens headed north to New England.

Subsequently, Plaintiff, feeling somewhat uneasy, called the shipping department and confirmed her worst fears. They had allowed the wrong trailer to leave the plant. Plaintiff said she then tried to reach her supervisor, Mr. Johnson, but could not get him. When she finished her shift, she telephoned him at home and, finding him, told him of the incident. It is apparent that Johnson by this time knew of the incident and told her she was terminated. In this regard, the Court accepts the testimony of Johnson that he had learned of the incident when he called into the plant to check the status of things as was his custom when he was off-duty.

The next day, Plaintiff was requested to report for regular duty pending an investigation. At the end of that shift, she was terminated. A reprimand was entered in her personnel records which she signed and accepted. Johnson's written comments are noteworthy. He cited the Plaintiff for "[f]ailing to work according to standards set up by your immediate supervisor. No [sic] working as a partner at her assigned work station." Defendant's Exhibit 10.

This apparently was a continuation of a developing problem with Plaintiff. John-

son had found that it was becoming increasingly difficult for other security guards to work with the Plaintiff. Johnson ascribed the problem to Plaintiff's personality. Johnson, however, referred to the trailer incident as the immediate objective basis for the reprimand and wrote, "Nancy knew at the time there was a mistake. Done nothing." Defendant's Exhibit 10.

This was Plaintiff's fourth and final reprimand.

The Plaintiff had started work on April 1, 1982, and was fired August 6, 1983. The intervening time was not uneventful. Her supervisor, Dennis Johnson, gave her several reprimands which became part of her personnel file. The reprimands were part of a progressive discipline program at Perdue in which an employee could accumulate only four reprimands before being dismissed.[1] Reprimands could be worked off under some circumstances after six months. On February 21, 1983, the Plaintiff received an oral reprimand from supervisor Johnson because she had left her assigned post to travel to Georgetown for dinner. Defendant's Exhibit 7. Although the Plaintiff denies she ever received this oral reprimand, the Court accepts the testimony of Mr. Johnson that it was in fact given. The exhibit, Defendant's Exhibit 7, was part of Plaintiff's personnel file and there was no evidence from which one could question its integrity or authenticity.

On March 25, 1983, Mr. Johnson again reprimanded the Plaintiff. On this occasion, she was accused of leaving her assigned post and taking somebody to the cash sales outlet at the plant. Defendant's Exhibit 8. The incident was sufficiently severe in Mr. Johnson's mind that he marked this reprimand as reprimand "number 3" and "final" without suspension from work and advised Plaintiff that any further reprimand would result in her termination from employment. The Court finds that there were some violations of company rules for which reprimands could be jumped and employment terminated without the formality of four formal repri-

mands. In this case, the security of personnel and the plant itself would have been jeopardized by her absence from her post and jumping the "second reprimand" was not unusual. Without formal comment, the Plaintiff received the reprimand and signed it.

On July 13, 1983, Plaintiff was given another reprimand by Mr. Johnson. Defendant's Exhibit 9. In this incident, the Plaintiff was charged with using profanity against and arguing publicly with a fellow employee. This reprimand was captioned "third offense" and "final warning" and, without formal comment, Plaintiff signed the reprimand. Significantly, the upper righthand corner of this reprimand lists the other reprimands received by Plaintiff within the same six month period. Therefore, Plaintiff was clearly on notice that another reprimand during the next six months would lead to termination of her employment.

Plaintiff contends that she was fired because she is a woman, not because of the trailer incident. She alleges that her supervisor, Mr. Johnson, had a discriminatory animus against hiring women as security guards and, as a matter of fact, she was only the second woman since 1979 that was hired for guard work. She said she was treated differently from the male guards in the way she was disciplined and terminated.

To support her allegations, Plaintiff called LaVerne Nichols who testified she was employed as a security guard immediately after Plaintiff had been fired. She said Johnson had asked her why she wanted to be a guard and said, "Because it's a man's job?" She also testified that Johnson said he would not allow women to work between midnight and 8:00 a.m. She alleges that Johnson made this remark to her before she was hired and while no one else was present.

To demonstrate her inequitable treatment of being given the reprimand of February 21, 1983, the Plaintiff called Joe May

---

**1.** Processing Employee Handbook, Defendant's Exhibit 28, p. 21.

who testified that it was customary for the guards on duty to leave their posts to get food from Georgetown. Plaintiff even testified that she met Johnson on her way to Georgetown and, after determining where she was going, that he said "Okay."

On another occasion, Niblett testified that Johnson, referring to Plaintiff, said to him, "I can't let her do that, she's a woman. We should never have hired a woman." Johnson allegedly said words like this on three occasions.

Plaintiff also testified that in her interview with Mike Kelly, the head of personnel at Perdue, Kelly said to her, "we don't hire women" as security guards. She claimed that Johnson said, "I really don't like to hire women," and at her final interview, both Kelly and Johnson had said that "it was going to be hard on me" if she were hired and that the male guards might not like her.

To further show Perdue's disparate treatment between her and Long, she proved that Long was not fired for the trailer incident. Although Niblett was fired, Plaintiff sought to foreclose any other reason for his termination except that it was related to his injury on the job. In support of this, she wanted to use the Industrial Accident Board's transcript which she contends concluded that Niblett had not been terminated for the trailer incident but because of his industrial accident.

Plaintiff sought to prove there was recurring discriminatory treatment during her tenure as a guard by saying that when people had to be ejected from the plant property, the supervisors always asked for male guards. (Plaintiff is approximately five feet tall.)

Finally, according to Plaintiff, Johnson suspected her of having been an informant for Perdue when Johnson was being investigated for theft, an investigation which ultimately resulted in his discharge. Therefore, Plaintiff views Johnson's testimony against her as biased and, as a result, incredible.

■ In an employment discrimination case based on disparate treatment, the Plaintiff must prove that the Defendant intentionally discriminated against her. The standard by which that burden is measured is the "but for" test. *Smithers v. Bailar*, 629 F.2d 892, 898 (3d Cir.1980). It is best described by a footnote in *Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 n. 1 (3d Cir.1985), in which the Court said:

> The "but for" test does not require a plaintiff to prove that the discriminatory reason was *the* determinative factor, but only that it was *a* determinative factor. *See Smithers v. Bailar*, 629 F.2d 892, 898 (3d Cir.1980) ("a plaintiff need not prove that [the discriminatory reason] was the employer's sole or exclusive consideration but, ... he must prove that [the discriminatory reason] made a difference in deciding the promotion, retention, or discharge"). Interpreting Title VII to require proof of "the determinative factor" is inconsistent with the "but for" causation test, insofar as plaintiff would be required to show that the discriminatory motive was the *sole* reason for the action taken. More than one "but for" cause can contribute to an employment decision, and if any one of those determinative factors is discriminatory, Title VII has been violated.

■ The burden of proof in meeting that standard is usually but not necessarily a three step procedure. Initially, the Plaintiff has the burden first of showing by a preponderance of the evidence a *prima facie* case of discrimination. To establish such a case, the Plaintiff need show only that she was a member of a protected class and that she was fired from a job for which she was qualified while others not in the protected class were treated more favorably.

■ Once a *prima facie* case has been established, the Defendant then has the burden to dispel the adverse inference of the *prima facie* case by articulating a legitimate non-discriminatory reason for the

Defendant's action.[2] If the evidence by the Defendant raises a genuine issue of fact, then the presumption of the *prima facie* showing is dropped and the Plaintiff must then carry her ultimate burden of persuasion that Defendant's alleged reasons for the firing were pretextual, that is, "that the defendant intentionally discriminated against the plaintiff...." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. at 1093 (1981).

■ In the present case, there is little doubt that the Plaintiff proved a *prima facie* case. She is a member of a protected class who was discharged from a job for which she was qualified while males in the same work were not discharged. Specifically, Paul Long, the male guard who was with Plaintiff on the night of the trailer incident, was not fired.

■ The Defendant claims that the Plaintiff was discharged because of the severity of the violation of her duty as a security guard and because she had been forewarned that the next violation or reprimand would be her last. It also contends that the reprimand was in fact her fourth and final reprimand received within a six month period and discharge was appropriate under then existing personnel rules.

The Court concludes that the Defendant met its burden of raising a genuine issue of fact by articulating a legitimate non-discriminatory reason for Plaintiff's discharge. To determine whether these particular reasons were pretextual, it is essential to evaluate the evidence offered by the Plaintiff which allegedly supports the proposition that Johnson was prejudiced against her because of her sex. As a consequence of that background of prejudice, the Plaintiff contends that her discharge was not warranted but for the discriminatory animus. In support of this, LaVerne Nichols testified that Johnson asked her why she wanted to be a security guard. "Because it's a man's job?" he asked. She also said that Johnson had a predisposition about the abilities of a woman to work certain shifts. She said he told her he would not allow women to work between midnight and 8:00 a.m. In a similar vein, Douglas Niblett testified that Johnson had told him that he should never have hired a woman and he should not allow Plaintiff to do certain work because "she was a woman." (Niblett could not remember the exact words but said Johnson said something like that on at least three occasions.) Pizzuto herself said that Mike Kelly said "we don't hire women." And Johnson had told her before her hiring, "I really don't like to hire women." Pizzuto also said that Kelly and Johnson both told her that the male guards might not like her and that "it would be hard on [her]."

Kelly and Johnson deny making any of the statements attributed to them. And the Court accepts their version of the events and statements and rejects that of Nichols, Pizzuto and Niblett. The reason is rather elementary. Pizzuto contends, for instance, a discrimination by Kelly and Johnson against hiring women and yet Nichols and Pizzuto were hired. She also contends that women were looked upon as being of a lesser quality in a guard job. For instance, she said Johnson and Kelly would not put women on the midnight to 8:00 a.m. shift but the fact is both Pizzuto and Nichols were assigned those shifts. Furthermore, it would be extremely disingenuous to suggest a predisposition against hiring women or not wanting a woman for the job when one considers Johnson's actions in the Pizzuto and Nichols hiring. As to Pizzuto, he listened to her plea for a job and actually brought the employment application to her. She gave it to him to turn in to personnel. He participated in the hiring interview and recommended she be hired. And she was. And she was placed on shift work at times she specifically requested.

As to Nichols, the Court finds there was no preexisting discriminatory animus against women prior to her hiring. It

---

**2.** The burden is one of production not one of persuasion. *Texas Dept. of Community Affairs*

*v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

would be difficult to find a case which demonstrates such a lack of animus more forcefully than this case. Nichols was hired within seven days after Plaintiff was fired. And what makes the accusation even more incredulous is that Johnson, the very man accused of the bigotry, was the man who hired her and assigned her to the midnight to 8:00 a.m. shift.

In general, all of the accusations of prejudice attributed to Johnson and/or Kelly were fragments of conversations taken from context and seized as evidence to support the proffered conclusion. They have not supported such a conclusion. What remains then is why they were said and the context in which they were said. The Court finds that indeed women were told of the work and work conditions to which they would be subjected. The same things were told to male counterparts. In describing the duties and work conditions, it was obviously necessary to alert a five foot woman that she would be required to open and close trailer doors that a five foot, ten inch, one hundred eighty-five pound male found difficult to do. Additionally, in describing the working conditions, Kelly and Johnson were not. suggesting that women could not perform work that men were doing. They were only advising the women about the mud, the manure, the rain and the stench of the job that both men and women had to face.

With those allegations aside, the specifics of the immediate events which led to the discharge are the crucial issues that remain. Pizzuto claims that she was fired when Long, a man equally to blame in the trailer incident, was not fired.[3] Further, Pizzuto claims she did not receive four reprimands and that the male guards who had received more than four reprimands were not fired.

As indicated earlier, Pizzuto received a reprimand on February 21, 1983, March 25, 1983, July 13, 1983 and finally one on August 9, 1983. With regard to the one on

February 21, 1983, Plaintiff contends she was not aware of such reprimand. The Court rejects that testimony and accepts the testimony of Johnson who testified he gave her notice of the reprimand orally. No more was required on the first reprimand. The Court further finds that employees did leave their posts to get dinner when the Perdue cafeteria was closed but the absence was conditioned upon the volume of work and traffic at the time. This was confirmed by Joseph May, a co-worker who testified that the guards could not leave their posts "when the gate was busy." The Court finds that the reprimand was not disparately given and in fact was warranted in the mind of Johnson. The Court can easily dismiss Johnson's apparent approval of her leaving her post when he met her en route to Georgetown. In response to his question about her destination, he said, "Okay." But Johnson was away from the plant and had no way of knowing the conditions of traffic at that moment. Assuming Plaintiff had picked an appropriate time to leave, naturally he would say, "Okay." It was only after Johnson had returned to the plant and learned of the traffic that he determined Plaintiff had abused the privilege.

The Court finds that the reprimand of July 13, 1983, for using profane language toward another guard was one of two identical reprimands given that day. One was given to Plaintiff and one to her male counterpart in the argument, Oren Yoder. Similarly, Plaintiff failed to prove how the reprimand of March 25, 1983, was different from what male counterparts received under similar circumstances.

With regard to the fourth and final incident before discharge, Long was not discharged with Plaintiff for very good reasons. First, Perdue management felt that Long was not a participant in the trailer mishap and decided not to reprimand him. The Court finds Perdue management's decision not to reprimand Long for this par-

---

**3.** Whether Niblett was fired for the incident or whether Perdue is foreclosed from contesting the conclusion of the Industrial Accident Board that he was discharged because of his disability will be discussed later in this opinion.

ticular incident to be reasonable. Long's credible testimony indicates that he did not become aware that a mistake had been made until the truck had already left the scales area. Supervisor Johnson felt that Long had properly performed his task—reading and calling out the trailer number to Niblett. According to Johnson, the responsibility for the incident fell to Niblett and the Plaintiff exclusively. His investigation of the incident led him to conclude that both Niblett and Plaintiff knew of the mistake in time to stop the truck before it left Perdue property. As a result, he recommended that both be terminated. The Court is not concerned with the correctness of Johnson's decision not to reprimand Long with Niblett and Pizzuto. All that matters for purposes of this Title VII suit is whether Plaintiff was treated differently from other employees because of her sex. The record discloses that, at least so far as employee Long is concerned, Perdue has presented a credible nonpretextual explanation for its failure to discharge or even reprimand him. The Court rejects Plaintiff's argument that the disparate treatment of her and Long was motivated in part by discriminatory animus. *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251 (5th Cir.1977).

Even if Long had been reprimanded for this mishap, he would not have been discharged since the usual and customary and indiscriminate policy of requiring at least four reprimands had not been met in his case. Long had less than three reprimands in his personnel record prior to August 5, 1983. Personnel File of Paul Long, Plaintiff's Exhibit 1. Still, Plaintiff insists that Long's post-August 5, 1983 personnel record shows that Long received more than four disciplinary warnings within a six month period and that he was not terminated. However, these reprimands were for absences and tardiness and related incidents and, as was proven by the Defendant, were not such reprimands as would be considered for discharge.[4]

Plaintiff further contends that Douglas Niblett was fired by Perdue not because of the mistake but because he had sustained an on-the-job injury which the Company felt lessened his value as an employee. Plaintiff believes that since Niblett, a male employee, was not fired for the trailer mishap, she has satisfied her burden of showing disparate treatment. Plaintiff relies heavily on a finding by the Delaware Industrial Accident Board that Niblett was terminated due to his injury to support her conclusion that she is a victim of disparate treatment.

■ The Court concludes from the record that both Niblett and Plaintiff were discharged as a result of the trailer mishap. Niblett's personnel record shows that the August 5, 1983, trailer incident was his fourth warning (with the third offense having occurred within the prior six month period) and that termination was appropriate according to the existing Perdue policy. And Niblett's prior reprimands were not for tardiness or other minor offenses; they were for sleeping on the job and for leaving the security area while he was on duty. The Court is not bound by the conclusions of an unreviewed decision of an administrative body, *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 470 n. 7, 102 S.Ct. 1883, 1891 n. 7, 72 L.Ed.2d 262 (1982); *Bottini v. Sadore Management Corp.*, 764 F.2d 116 (2d Cir.1985); *Elliott v. University of Tennessee*, 766 F.2d 982 (6th Cir. 1985), and is unpersuaded by the conclusion of the Delaware Industrial Accident Board ("DIAB") that Niblett was fired because of his accident. First, the hearing before the DIAB was held only for the purpose of determining the extent of Niblett's disability to ascertain the amount of compensation due him through Perdue's insurer. Most of the evidence received at the administrative hearing, therefore, dealt with evidence of the injury itself and consisted of testimony from medical doctors. Although Perdue

---

4. Douglas E. Morrow, Perdue Plant Manager, testified that the company's Progressive Disciplinary System distinguished between infractions

which impacted on safety or involved job conduct and those involving employee absences or tardiness (which were considered less serious).

was represented by counsel, there is no basis for the Court to conclude that Perdue fully litigated the issue of Niblett's dismissal. The company presented only one witness, Douglas E. Morrow, Perdue personnel assistant, who testified that Niblett had been fired due to the trailer mishap. Ms. Pizzuto testified for Niblett.

Plaintiff introduced evidence of other Perdue employees whom she alleges were not terminated under circumstances similar to her own. However, close review of these histories in light of Perdue's progressive disciplinary system shows that no disparate treatment occurred. For example, Plaintiff presented evidence that Lewis McCrall logged the wrong number on a trailer which left the plant and he was not discharged. The evidence established that the incident of November 7, 1983 differed from Plaintiff's as it represented a first reprimand. Later, on January 11, 1984, after McCrall had accumulated four reprimands, he was discharged. Plaintiff presented evidence that Joseph Miller did the same thing on or about March 4, 1983 and he was not discharged. The evidence established that he had no previous reprimands and the severity of this offense was not the same as Plaintiff's. Miller did not know a mistake had been made. (The Court finds that Plaintiff knew of her mistake and did nothing about it when with some effort the mistake could have been corrected or the consequences mitigated and those facts were a determinative difference in the mind of the Defendant.) Plaintiff presented evidence that Joseph Baxter did the same thing and he was not discharged. The evidence established that the incident represented a "first reprimand." [5] Plaintiff presented evidence that Raymond Sederquest did the same thing on November 15, 1983 and he was not discharged. The evidence established that the incident represented a "first reprimand." Later, he had additional reprimands but considering the "six month rule", he did not reach a fourth reprimand.

The Court concludes that the Defendant has met its burden of production by presenting evidence to support a legitimate non-discriminatory reason for Plaintiff's discharge. The Plaintiff has failed to carry her ultimate burden of persuasion that the given reason was pretextual, that is, she failed to carry her burden of proof on intentional discrimination.

---

**5.** In fact, this was a second reprimand but it was proven that Perdue had a policy that allowed the discharge of a reprimand after six months. There was a question about how the policy read and how it was construed and applied but the Court accepts the testimony of Mr. Morrow of how it was applied.