QUAKER HILL PLACE, Respondent
Below, Appellant,

v.

Raymond SAVILLE, Complainant
Below, Appellee.

Superior Court of Delaware,
New Castle County.

Submitted: Jan. 22, 1987.
Decided: Feb. 10, 1987.

Richard R. Wier, Jr., and Wendie E. Cohen of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for respondent below, appellant.

Neilson C. Himelein, of Community Legal Aid Soc., Inc., Wilmington, and Barbara R. Paul of Delaware Volunteer Legal Services, Inc., Wilmington, for complainant below, appellee.

MOORE, Justice *.

This appeal is from a final order of the State Human Relations Commission (the "Commission") finding the appellant, Quaker Hill Place, to have unlawfully discriminated against appellee, Raymond Saville, Jr., in violation of 6 *Del.C.* § 4603(1).[1] Allegedly, Quaker Hill refused to rent an apartment to Saville because he suffered from a mental handicap. Quaker Hill maintains that Saville was denied an apartment based on criminal or antisocial behavior reasonably constituting a threat to the

safety of the premises or the safety of other tenants, their property or guests.

This is the second time I have considered the issue. Earlier, this Court reversed, as contrary to fact and law, a prior ruling of the Commission that Quaker Hill had wrongfully denied Saville an apartment. The matter was remanded to the Commission for further proceedings consistent with the Court's opinion. *Quaker Hill Place v. State Human Relations Commission*, Del.Super., 498 A.2d 175 (1985) (*Quaker Hill I*).

In the present appeal, Quaker Hill contends that the findings and conclusions of the Commission on remand: (1) were not consistent with the standards established in *Quaker Hill I*; (2) were neither supported by substantial evidence nor the product of an orderly and logical deductive process; and (3) were tainted by overt acts of prejudice toward Quaker Hill by the chairman of the Commission panel hearing the matter. After full briefing, oral argument, and a careful examination of the record on remand, it is evident that the Commission did not properly apply the appropriate legal standards of *Quaker Hill I*, when evaluating the discrimination claim. Moreover, the Commission's conclusions are not the product of an orderly and logical deductive process, nor are they supported by substantial evidence on the record. Finally, and most regrettably, I must conclude from the record that the Commission acted contrary to elemental standards of fairness and due process. Thus, under all the circumstances, any one of which would mandate rever-

---

* Sitting by Designation Pursuant to Del. Const. art. IV, § 13.

1. With certain exceptions Delaware law, independently of any federal statute, rule or regulation, prohibits discrimination in housing because of a tenant's handicap. Thus, 6 *Del.C.* § 4603(1) provides in pertinent part:

 Except as provided in § 4604 of this title, it shall be an unlawful practice for any person, because of race, age, marital status, creed, color, sex, handicap or national origin of another person to:

 (1) Refuse to sell or rent, or refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny to any person, a dwelling offered to the public for sale or rent;

 \* \* \* \* \* \*

6 *Del.C.* § 4603(1).

The relevant exceptions provide that:

 (c) The provisions of this chapter as to discrimination based upon handicap shall not require any person to modify the features or structure of a dwelling unless otherwise required by law or the following conditions are met:

 (1) A minor modification of the dwelling is requested by a tenant or prospective tenant and the tenant or prospective tenant bears the expense of the modification;

 (2) If requested by the landlord or owner, the tenant agrees in writing prior to the modifications to return the dwelling to its original state prior to vacating the dwelling.

6 *Del.C.* § 4604(c).

sal, the decision of the Commission cannot stand and must be reversed.[2]

## I.

Many of the pertinent facts material to this dispute were summarized in *Quaker Hill I*:

Saville has been diagnosed as suffering from "Bi-Polar Disorder, Mixed Type", an apparent form of manic depression, which the Commission assumed was the cause of Saville's occasional anti-social behavior.

In the summer of 1983 Saville applied for an apartment at Quaker Hill. On the application he indicated that he was mentally handicapped, citing the manic depressive condition. Apparently, this illness would entitle Saville to federal rent assistance in a private, federally subsidized housing project, like Quaker Hill, which provides apartments to the handicapped and elderly.

Despite excellent references, including a medical report that Saville could live in a socially responsible manner, Quaker Hill rejected the application. At the Commission hearing, Quaker Hill relied upon several instances of unusual behavior by Saville, including certain criminal acts. These included:

(1) In 1981 Saville became angered over late delivery of his mail. His hostility toward the postal authorities was further exacerbated by an increase in first class postage rates. There were acrimonious discussions about the former with his local postmaster, who had advised that the delivery problems related to Saville's location on the mail route. In response Saville demanded that the delivery routes be changed so that he would receive his mail first. When this was not done, he twice went to his local post office and each time bought $100 worth of 20¢ stamps by check. On a third occasion he went to a different post office and did the same thing. In each case he promptly stopped payment on the checks, advising his bank either that he did not like the new postage rates or that he did not like his postmaster. He was charged with felony theft, which the State offered not to prosecute. Instead, Saville demanded trial, was convicted and ultimately served a short prison term. Saville admitted at the Commission hearing that he used "poor judgment" in declining the State's offer to drop the charges.

(2) In 1979 Saville became angered over the gasoline crisis, which caused long lines at the pumps and restricted gas sales. He also was harboring animosity toward the Delaware State Police in connection with a prior arrest in 1975. Spotting the Governor's official automobile parked outside Legislative Hall in Dover, Saville decided to protest his grievances by letting the air out of the Governor's tires. After doing so, he later went to the Governor's office and gave the valve stems from the tires to a secretary. Although he was questioned by the State Police, no prosecution resulted.

(3) In June, 1982, Saville was hungry and without money. Allegedly, because he wanted to get arrested in order to receive a free meal in jail, and also because he harbored animosity toward the police for an earlier drunken driving arrest, he spray painted the letters "MADD" on a police car parked outside the State Office Building in Wilmington. He was arrested, fed, and released without prosecution.

(4) On another occasion Saville tried to telephone the President of the United States to complain about poor medical treatment he allegedly was receiving at a Veteran's Administration Hospital.

*Quaker Hill I*, 498 A.2d at 177–78.

Quaker Hill also claims to have relied on one further act of threatening behavior by Saville. At Saville's sentencing in the Superior Court on October 14, 1982 for the felony theft conviction, the Deputy Attor-

---

**2.** Significantly, both in *Quaker Hill I*, and throughout this appeal, the Attorney General has taken the position that the decisions of the Commission are contrary to law, and he has refused to defend the Commission's actions before this Court.

ney General prosecuting the case told the trial judge in open court that an alleged telephonic bomb threat to a local motel had been traced to Saville. That statement appeared in an October 15, 1982 Wilmington, Delaware, newspaper article headed: "Protesting stamp costs nets jail." The article stated in pertinent part:

Protesting the price increase of postage stamps cost Raymond L. Saville Jr. a 60–day jail sentence Thursday in Superior Court.

Judge Vincent A. Bifferato gave Saville, 37, of Sheldon Apartments, Old Forge Road, New Castle, three years for felony theft, with all but 60 days suspended for probation.

\* \* \* \* \* \*

Deputy Attorney General Alex Smalls said Saville had been involved in threats to a motel. He suggested that the court require Saville to take his medicine and attend a mental hygiene clinic.

Saville said he would like to know what Smalls was referring to in accusing him of having made threats. Smalls started to explain, but was interrupted by Saville's cry, "That's a lie."

\* \* \* \* \* \*

Smalls said that a motel had received a phone call warning of a bomb, the call was repeated and was traced to Saville. Saville denied the accusation.

\* \* \* \* \* \*

The article also referred to Saville's manic-depressive condition, his failure to take the medication prescribed, his "protest" of deflating the tires on the Governor's official car, a drunk driving conviction, and the episode of spray-painting a police car. Quaker Hill apparently learned of the bomb threat while conducting a newspaper search on Saville's past criminal behavior. Saville has at all times vehemently denied

making the threat, and no charges were brought against him in the matter.

After serving his October 14, 1982 60–day prison sentence for felony theft, Saville remained on probation until October 13, 1985. His application to Quaker Hill was in July 1983, approximately seven months after his release from jail. Quaker Hill's final rejection was on April 19, 1984. Thus, throughout the pendency of his application and all of the *Quaker Hill I* proceedings before the Commission and this Court, he was still serving his sentence of probation on the felony theft conviction.

In its decision upon remand, the Commission ordered Quaker Hill to rent to Saville, to pay Saville compensatory damages, such as moving expenses and rent differential, as well as costs, attorney fees and expert witness fees incurred by Saville during the course of litigation. Finally, the Commission ordered Quaker Hill to establish, with the assistance of the Commission, proper procedures for review of applications received from handicapped persons. Given the prior factual record of *Quaker Hill I,* and to avoid unnecessary repetition in this already long opinion, I have deferred to Parts V and VI a more detailed recitation and discussion of the Commission's findings of fact and conclusions of law.

## II.

Before addressing the merits, I first turn to Saville's claim that this appeal is untimely because the Commission panel decision was issued on January 28, 1986, and Quaker Hill did not appeal until July 21, 1986. *See* 29 *Del.C.* § 10142(b).[3] However, the January 28 opinion of a three member panel of the Commission does not constitute a "case decision" under the Administrative Procedures Act. Rather, it is a proposed order under 29 *Del.C.* § 10126(a).[4] The document was nothing

---

3. 29 *Del.C.* § 10142(b) provides:
 (b) The appeal shall be filed within 30 days of the day the notice of the decision was mailed.

4. 29 *Del.C.* § 10126(a) provides:
 (a) Whenever a subordinate presides over an informal conference or a formal hearing, he shall prepare a proposed order for the

consideration of the agency which shall include:
 (1) A brief summary of the evidence and recommended findings of fact based upon the evidence;
 (2) Recommended conclusions of law; and
 (3) Recommended decision.

more than the panel's recommendation of action to the Commission. It was neither properly authenticated nor did it contain the formalities required of a final order under 29 *Del.C.* § 10128(b).[5] It was not until June 20, 1986, that the Commission promulgated a final order under 29 Del.C. § 10128(b), and this timely appeal followed. Saville's contentions to the contrary are without merit, and his motion to dismiss the appeal will be denied.

### III.

■■■■ The Superior Court's scope and standard of review of decisions of the State Human Relations Commission are limited to a determination of whether the decision is supported by substantial evidence on the record and free from legal error. 29 *Del.C.* §§ 10142(d), 10161(5). Substantial evidence is more than a scintilla and less than a preponderance. *Olney v. Cooch*, Del.Supr., 425 A.2d 610, 612–13 (1981); *Quaker Hill I*, 498 A.2d at 178–79. Stated another way, it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Quaker Hill I*, 498 A.2d at 179. When the Superior Court sits as an intermediate court of appeals, the findings of an administrative agency must be supported by evidence sufficient to justify the legal conclusion reached. *Baker v. Connell*, Del.Supr., 488 A.2d 1303, 1309 (1985). The Superior Court's standard and scope of review are in accordance with *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972), so that if the Commission's findings are not supported by substantial evidence of record, or are not the product of an orderly and logical deductive process, then the decision cannot stand. *Baker*, 488 A.2d at 1309; *Quaker Hill I*, 498 A.2d at 179.

### IV.

### A.

■■■■ At the first hearing in 1984, insufficient evidence was presented to sustain a

conclusion that there was any nexus between Saville's aberrational behavior and his alleged mental handicap. I am satisfied that the evidence presented at the hearing on remand adequately established such nexus. However, that is merely a threshold issue respecting the Commission's jurisdiction over the complaint. *Quaker Hill I*, 498 A.2d at 180, 184. It is not determinative of the ultimate question whether such unusual behavior formed a legitimate independent basis for rejecting the applicant. *Quaker Hill I*, 498 A.2d at 177, 181–183. As I explicitly ruled in *Quaker Hill I*, a landlord may impose reasonable qualifications upon a prospective tenant suffering a mental handicap when those qualifications are rationally related to the applicant's financial responsibility, the safety of other tenants and their guests, and the safety of the landlord's property. *Id.* at 182.

### B.

■■ The parties disagree as to whether Section 4603(1) requires an intent to discriminate. As stated in *Quaker Hill I*, the standards announced in the United States Supreme Court trilogy, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Bd. of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), are applied when determining the order and allocation of the burdens of production and persuasion in private, non-class action, Section 4603(1) discrimination cases. *Quaker Hill I*, 498 A.2d at 182–83.

The *McDonnell Douglas/Burdine* standard, by definition, is applicable only where intent to discriminate is an element of the action. *Quaker Hill I* obviously contemplated this, and in my opinion a claim brought under Section 4603(1) for discrimi-

---

**5.** This section provides:

(b) Every case decision of any agency shall be incorporated in a final order which shall include, where appropriate:

(1) A brief summary of the evidence;

(2) Findings of fact based upon the evidence;

(3) Conclusions of law;

(4) Any other conclusions required by law of the agency; and

(5) A concise statement of the agency's determination or action on the case.

29 *Del.C.* § 10128(b).

nation based upon a protected classification requires such proof as an essential part of the complainant's case. *See Quaker Hill I,* 498 A.2d 182–183.

Counsel for Saville argues that proof of discriminatory intent is not required under Section 4603, citing *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1984) (interpreting the Federal Rehabilitation Act). However, as I previously noted, the cases applying components of the Federal Rehabilitation Act are not particularly helpful when analyzing Section 4603. *Quaker Hill I,* 498 A.2d at 179.

Section 4603 prohibits discrimination in housing based on handicap, race, age, marital status, creed, color, sex or national origin. Thus, Section 4603 is an all-encompassing antidiscrimination statute, whereas the Federal Rehabilitation Act is addressed mainly to the discriminatory problems faced by the handicapped. If Saville's argument was accepted, persons invoking Section 4603 for discrimination other than a handicap would be required to establish intent, while handicapped individuals seeking relief under the same statute would be relieved of this requirement. I consider that result illogical and refuse to create such a statutory dichotomy. Further, Section 4603 is not an affirmative action statute. 6 *Del.C.* § 4602;[6] *Quaker Hill I,* 498 A.2d at 181. However, the Federal Rehabilitation Act, cited by Saville as analogous to Section 4603, is an affirmative action statute. *Alexander v. Choate,* 469 U.S. at 300 n. 20, 105 S.Ct. at 721 n. 20 (1985). The Delaware law, unlike the federal act, does not contemplate remedial measures to compensate victims of past discrimination. Rather, the Delaware statute seeks only to eliminate certain inequities imposed upon the handicapped and other classes of individuals.

My prior opinion delineated the burden of proof in proceedings before the Commission, where the claim is one of discrimination based on a mental handicap or impairment. The complainant must establish the following elements to present a prima facie case of discrimination:

(1) Complainant is handicapped as defined in 6 *Del.C.* § 4601(7);

(2) That complainant was a qualified tenant;

(3) That complainant was denied the rental unit; and

(4) Where applicable, that the unit was later rented to a non-handicapped person.

*Quaker Hill I,* 498 A.2d at 183.

Once complainant establishes his prima facie case, the *burden of production*[7] shifts to the person charged with discrimination to *articulate* a legitimate, non-discriminatory reason for the rejection. Under both Delaware and federal law the ultimate burden of proof that the defendant intentionally discriminated against a person remains at all times with complainant. 29 *Del.C.* § 10125(c); *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The burden that shifts to the defendant is to rebut the presumption of discrimination

> by producing evidence that the [complainant] ... was rejected ... for a legitimate, non-discriminatory reason. The

---

**6.** 6 *Del.C.* § 4602 provides:

This chapter is intended to eliminate, as to housing offered to the public for sale or rent, discrimination based upon race, age, marital status, creed, color, sex, handicap or national origin, and to provide an administrative procedure through which disputes concerning the same may effectively and expeditiously be resolved with fairness and due process for all parties concerned. This chapter shall be liberally construed to the end that its purposes may be accomplished and all persons may fully enjoy equal rights and access to housing for themselves and their families.

**7.** The term "burden of proof" actually encompasses two separate burdens. One burden is that of producing evidence, satisfactory to the judge, of a particular fact in issue. That is the burden of producing evidence. The second is the burden of persuading the trier of fact that the alleged fact is true. The latter is the burden of persuasion. The burden of producing evidence on an issue means the liability to an adverse ruling, generally a finding or directed verdict, if evidence on the issue has not been produced. The burden of persuasion is crucial only when the parties have sustained their burdens of producing evidence and only after all the evidence has been introduced. McCormick, *Evidence* § 336 (2d ed. 1972).

defendant need not persuade the court that it was actually motivated by the proffered reasons ... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the [complainant]. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for ... rejection. The explanation must be legally sufficient to justify a judgment for the defendant ... Placing this burden of production on the defendant thus serves simultaneously to meet the [complainant's] prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the [complainant] will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. 254–56, 101 S.Ct. 1094–95 (citations omitted) (footnotes omitted).

In *Quaker Hill I*, this Court ruled that legitimate, nondiscriminatory reasons for rejection of a mentally handicapped or impaired applicant could include considerations "rationally related to the tenant's ability to meet his or her financial obligations, the safety of the premises, and the safety of other tenants." *Quaker Hill I*, 498 A.2d at 182.

I also explicitly recognized that a landlord could not establish arbitrary and capricious qualifications applicable to the mentally handicapped or impaired: "Recognizing that those with mental handicaps may exhibit unusual forms of behavior, it is vital that any qualifications imposed be neither arbitrary nor capricious so as to negate the obvious intent of our law—that those with mental handicaps are to be accorded meaningful access to housing." *Id.* This leads directly to the third and final stage of the *McDonell Douglas/Burdine* standard.

■ After a landlord has *articulated*, not proven, a legitimate nondiscriminatory reason for the applicant's rejection, complainant then must demonstrate that the proffered reason was a sham:

This burden now merges with the ultimate burden of persuading the court that she has become the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the [landlord] or indirectly by showing that the [landlord's] proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

### C.

■ There is a critical legal dispute between the parties—whether we are dealing with a disparate treatment or a disparate impact case. The differences in the nature and quality of evidence required in such cases are significant. The *McDonnell Douglas/Burdine* standard applies in disparate treatment cases; that is, where an applicant is rejected based on an unlawful whim of the landlord. Proof of motive to discriminate, therefore, is an essential element of the complainant's case. *Quaker Hill I*, 498 A.2d at 182–183.

The analysis required in disparate impact cases derives from *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Griggs* held that an employer was prohibited, under Title VII, from imposing a facially neutral requirement or qualification, not significantly related to job performance, which disproportionately excluded a protected class of individuals from employment. *Id.* at 436, 91 S.Ct. at 856. In such cases statistical evidence without proof of motive usually is sufficient.

At oral argument Saville contended that Quaker Hill had adopted a *Griggs*-type qualification by requiring an applicant to possess the ability to meet his financial obligations and not threaten the safety of the premises or other tenants. Saville argues that such a qualification disproportionately excludes mentally handicapped or impaired persons from residing at Quaker Hill and therefore establishes discriminatory intent.

I find this argument unpersuasive. *Griggs* recognizes that a standard which is significantly related to legitimate purposes of an employer is permissible, notwithstanding any disproportionate impact. *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853. Thus, even under a disparate impact theory, qualifications imposed by a landlord regarding an applicant's ability to pay and his potential threat to property and other tenants certainly are "significantly related" to legitimate landlord objectives. *Quaker Hill I*, 498 A.2d at 182. Further, Saville introduced scant evidence at the hearing to demonstrate any disproportionate impact on mentally handicapped applicants to Quaker Hill, and on this record I find any such theory to be legally and factually insupportable.

The focus then must be on the Commission's decision under a disparate treatment analysis.

### V.

The Commission found that Quaker Hill had discriminated against Saville for the following reasons:

(1) Quaker Hill rejected Saville based, in part, on false information;

(2) The rejection letters mailed to Saville lacked adequate specificity;

(3) Quaker Hill did not afford Saville a fair opportunity to respond;

(4) Quaker Hill was required, but failed, to take into consideration Saville's alleged rehabilitation;

(5) Quaker Hill failed to weigh Saville's current behavior against his past actions; and

(6) Quaker Hill failed to address whether Saville was now taking his medication regularly, permitting him to live in harmony with others.

For the numerous reasons stated below, I conclude that the Commission failed to apportion the burden of proof properly; made factual findings unsupported by substantial evidence of record; and drew inferences and reached conclusions which were not the product of an orderly and logical deductive process, contrary to the requirements of *Levitt v. Bouvier* and *Baker v. Connell.*

### A.

I have outlined the burden of proof in Section 4603(1) cases extensively in Part IV. It is critical to emphasize that the burden of persuasion remains at all times upon the complainant to establish a Section 4603(1) violation. The Commission erred as a matter of law in repeatedly shifting the burden of persuasion to Quaker Hill to prove lack of discriminatory intent. The following excerpt from its decision illustrates this point:

> ... Saville has proven the basic elements for a claim of unlawful discrimination under § 4603, as set forth by Superior Court: Saville is handicapped; his application to rent was denied, and the denial by Quaker Hill was because of his handicap. *The burden of proof, at this point, shifts to Quaker Hill to "articulate some legitimate, nondiscriminatory, reason for the rejection".... As an academic proposition, it seems to us the ultimate burden of proof on this issue might fall on either party:* if the reason for rejecting an applicant was something apart from established tenant selection criteria, then the landlord would seem to have the burden to prove it was a legitimate nondiscriminatory consideration; on the other hand, if the landlord had established a general qualification standard which all applicants had to meet, which was facially nondiscriminatory, then the applicant might have the burden of proving either that he met the standard or that the standard was being misapplied in a discriminatory way against him.

*Commission Panel Division*, State Human Relations Commission, Jan. 28, 1986 (Bell, C. (Chairman), Cruz, C., Shane, C.) at 9 (emphasis added).

It is apparent that the panel either failed to understand the allocation of the burden of proof (including the burdens of production and persuasion) in Section 4603 cases, or decided to allocate the burdens as it saw fit.

Saville did establish his prima facie case: that he was handicapped; that he was a qualified tenant; and that he had been rejected. The burden of producing evidence, i.e., articulating a legitimate nondiscriminatory reason for the rejection, thus shifted to Quaker Hill. The record clearly establishes five reasons—at least four of which were acts of criminal conduct—for rejecting Saville: the post office felony theft incidents and conviction; Saville's conduct in letting the air out of the Governor's tires; his spray-painting a police car; the telephonic protest call to the President; and the alleged bomb threat.[8]

Upon that record Quaker Hill plainly met its burden of production. Saville was then required to prove that these reasons were a sham, or establish by other credible evidence that Quaker Hill intentionally discriminated against him. The record is devoid of substantial evidence to support such claims.

Yet, without factual support the Commission concluded that the reasons articulated by Quaker Hill were unintelligent "stereotypical" pretexts:

As we view the evidence, it appears clear that Quaker Hill did experience real concern regarding Saville's history of erratic behavior, but it appeared to be on a stereotypical basis, not an intelligent evaluation of his condition and the prospects for his being able to have a successful tenancy ...

*Commission Panel Decision* at 10.

### B.

Regarding the bomb threat, Quaker Hill was disparaged for relying on a matter that did not lead to a prosecution:

With regard to the evidence that Quaker Hill considered that Saville was involved with an "alleged bomb threat", Saville vigorously denied this in his testimony. For a variety of reasons, we conclude that Saville was being truthful in his denial. None of the eccentric behavior which Saville admitted involved any threat of personal injury; he freely talked of the other incidents; there was no attempt to verify this charge, or ascertain what evidence did exist; and, *with such a serious matter, one would expect a prosecution if there was support for it.* Since Quaker Hill did not tell Saville which incidents it was relying on, we cannot tell how large a part the alleged bomb threat played in Saville's being rejected, but it seems to us that it is the most serious of all five incidents and it is clear that Quaker Hill continued relying on it at least until the time of the 1984 hearing in this case ... Thus, we conclude that Quaker Hill's rejection of Saville's application was based to some significant degree upon false information.

*Commission Panel Decision* at 15 (emphasis added).

The foregoing demonstrates the Commission's mistaken approach. The bomb threat issue was not a question of whether Quaker Hill relied on evidence sufficient to support a prosecution or conviction, but whether it was reasonable under all the circumstances for Quaker Hill to take such information—derived from a statement made by a Deputy Attorney General in open court—into account when refusing to rent an apartment to Saville. No one denies that the statement was made, and right or wrong in terms of its truth, when judging Quaker Hill's discriminatory intent vis-a-vis Saville's undisputed acts of criminal conduct, the landlord cannot be faulted for acting in a manner consistent with its clear right and duty to protect its own property and the safety of other tenants. *Quaker Hill I*, 498 A.2d at 177, 182. The correct focus should have been upon Quaker Hill's intent, not an improper attempt by the Commission to substitute its own judgment, after the fact, for the landlord's. This was patent legal error and contrary to well-established principles of antidiscrimination law. *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1097; *Reeves v. General Foods Corp.*, 682 F.2d 515, 520–24 (5th Cir.1982); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011–

---

**8.** I conclude that Quaker Hill was justified in relying on the alleged bomb threat as evidence of Saville's socially unacceptable behavior. See the discussion, *infra*.

12, nn. 5–6 (1st Cir.1979). Even if the landlord was wrong as a matter of fact, provided it has acted reasonably and in good faith, the Commission's own notions of what should have been done are irrelevant and quite beyond its lawful authority. *Wright v. Western Elec. Co., Inc.,* 664 F.2d 959, 964 (5th Cir.1981); *Jefferies v. Harris County Comm. Action Ass'n,* 615 F.2d 1025, 1036 (5th Cir.1980); *Loeb v. Textron, Inc.,* 600 F.2d at 1012 n. 6; *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1256–57 (5th Cir.1977); *Pizzuto v. Perdue Inc.,* 623 F.Supp. 1167, 1174 (D.Del.1985); *Hicks v. Sears, Roebuck & Co.,* 503 F.Supp. 930, 938 (E.D.Pa.1980); *Rivers v. Westinghouse Elec. Corp.,* 451 F.Supp. 44, 49 (E.D.Pa.1978); *Heath v. Greyhound Lines, Inc.,* 17 F.E.P. 812, 814 (S.D.Ohio 1978) [Available on WESTLAW, DCTU database]. As noted in *Heath v. Greyhound Lines:*

> ... Defendant is entitled to exercise judgment and in so doing may well be wrong. So long, however, as defendant continues to exercise such judgment without unlawful discrimination, it may do so even though its judgment in an individual case later proves to be incorrect. In short, an employer has a right to be wrong, so long as he does not discriminate ...

17 F.E.P. at 814.

Thus, the Commission's after-the-fact effort to retry the issue, by concluding that Saville was truthful in his denial, has no relevance to Quaker Hill's discriminatory intent at the time Saville was denied housing. Moreover, that conclusion cannot be said to be the product of an orderly and logical deductive process as required by *Levitt v. Bouvier.* First, Saville admits that when questioned about his past criminal behavior by representatives of Quaker Hill, he "clammed up" and refused to answer. Yet, the Commission completely ignored this undisputed fact when faulting Quaker Hill's judgment *at the time of rejection.* As Saville's handwritten complaint to the Commission stated:

> "... project manager at Quaker Hill cites certain behavior problems, *which I refused to discuss at a hearing with them.*
>
> *Because of this refusal* [the project manager] up held (sic) the earlier decision not to rent an apartment."

Complainant Questionnaire, Paragraph 12 (emphases added). In his testimony at the first hearing before the Commission on July 19, 1984, Saville admitted that:

> "... When I went into the hearing, they brought that up at the hearing that, you know, I painted this here police car *and wanted to know everything else at that time. And I said, from there I just clammed up, I said no.*"

(Emphasis added.)

Second, the Commission's apparent requirement that there be a prosecution before a landlord can rely on information relating to acts of criminal conduct is clearly unreasonable and finds no support in the law, and the Commission cited none. An unusual incident of threatened destructive and dangerous conduct may be relied upon if there is a reasonable basis for such action.

The Commission's approach ignores this record. While discounting the bomb threat for lack of a prosecution, it is undisputed that certain other admitted acts or criminal or antisocial behavior by Saville—spray painting the police car, deflating the tires and removing the valve stems on the Governor's official car—did not result in prosecutions. Indeed, but for Saville's own demand that he be prosecuted for the post office incidents of felony theft, it is an undisputed fact in this record that the State was prepared to drop even those serious charges. *Quaker Hill I,* 498 A.2d at 178. Thus, the Commission's rebuke of Quaker Hill—that "one would expect a prosecution if there was support for it"—comports neither with this record, logic nor the law.

Of course, a landlord may not act on any unreliable rumor when evaluating applicants; however, the source of the information here was a Deputy Attorney General's statement in open court that a bomb threat had been traced to Saville. If the bomb threat were the only example of

antisocial conduct by an otherwise exemplary applicant, it might be a closer question, but here the bomb threat was just one more instance of serious antisocial conduct indicating that Saville would pose a potential threat to Quaker Hill, its property and the property and safety of other tenants. Since the record is devoid of substantial evidence of unlawful discriminatory intent, I must conclude that Quaker Hill's reasons for rejecting Saville are legitimate, and the Commission's findings to the contrary are clearly erroneous.

 It was an incorrect analysis of the relevant issue, discriminatory intent, to focus on the truth or falsity of information relied upon by the landlord. *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1256–57 (5th Cir.1977). The pertinent question is whether the landlord actually relied on the damaging information.[9] If the landlord did not rely on the information, but instead rejected the applicant for some "discriminatory" reason, the landlord would be in violation of Section 4603(1) even if the information was correct.

 Because Saville did not establish that Quaker Hill's reasons were merely a pretext, he was required to persuade the trier of fact that a discriminatory reason more likely motivated Quaker Hill. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. However, the record would not support the latter conclusion. At most, during a meeting with Saville in April, 1984, Quaker Hill's local manager wrote in his notes that Saville "told some weird stories" and that he "sounds crazy." This is the only evidence that might suggest an improper discriminatory motive by Quaker Hill. But even that slim thread is subject to conflicting interpretations. Given the overwhelming evidence of criminal and antisocial conduct by Saville, this one strand of evidence, irrespective of its purport, does not rise to the level of substantial evidence establishing that Quaker Hill was motivated by discriminatory animus rather than legitimate landlord concerns.

## C.

The Commission also criticized Quaker Hill for not considering Saville's alleged rehabilitation. The Commission determined that Saville had, since 1982, decided to stay on his medication, and, as a result, he could show eighteen months of good behavior as of the date of Quaker Hill's final rejection. Thus, disregarding the appropriate legal standards and the scope of the issue before it, the Commission stated that the "real issue" was Saville's present compliance with his medical program. However, even while on that improper detour, the Commission plainly ignored the full purport of *all* such testimony.

First, the Commission itself unsuccessfully attempted to establish that the landlord could properly monitor Saville's medication program. This was plainly rejected by Dr. Tengiz M. Alatur, one of Saville's treating physicians, who testified in response to the panel chairman's question:

Q. Bell: Doctor, if you were engaged by a landlord in regard to possibly, consulted by a landlord and not any particular landlord, in regard to leasing an apartment to this patient and assuming he had up-to-date information, would you have any advise [sic] to a landlord as to what to look out for or what to do if they saw certain things? Are there things that can be done?

A: *I really don't see the landlord can be a judge for that.* I think the, what if there is a condition to be set, the condition has to be for him to follow with his clinic visits and with supervision with a trained physician or therapist."

(Emphasis added).

Second, the testimony on cross-examination of Dr. Marie-Helena Bauchwitz, another of Saville's treating physicians, further demonstrates the fallacy of the Commission's approach:

---

**9.** Of course, reliance by the landlord on unreliable information lacking in credibility would support a complainant's argument that the asserted justifications advanced by the landlord were a mere pretext masking unlawful discrimination.

Q: Well, my question to you, Doctor, is what you saw and what you treated him for. And in 1983 you only saw him on three occasions?

A: Yes.

Q: And the last time was in April of '83?

A: Exactly.

Q: Isn't it fair to say that, in your opinion at least up to 1984, based on what you know, he was not very reliable in terms of taking his medicine and showing up?

A: Yes, in 1983.

* * * * * *

Q: ... But, isn't it a fair statement based on what you knew in 1983 that if somebody was going to ask you, "Doctor, what is your prognosis on whether Mr. Saville is going to be taking his lithium and is not going to be going into a manic or hypo-manic stage?" you'd have to say, "Pretty poor."?

A: Well, is guarded.

Q: Guarded. Thank you.

* * * * * *

Q: Can you tell this Board with reasonable medical probability that Mr. Saville will always take his medication?

A: I couldn't guarantee that.

Q: You can't, can you?

A: Not absolutely.

Q: And, as soon as he stops, he represents a danger. Doesn't he?

A: Well, again, not necessarily. Could be, and maybe he doesn't have the same behavior again. And not all manic people behave like Mr. Saville at short times.

Q: With respect to an individual who is in the manic or hypo-manic phase, isn't it a characteristic of that phase that an individual doesn't feel that he needs medication?

A: That's correct.

Q: So, by definition, the nature of the disorder is such that when he's in a manic or manic phase he is, doesn't recognize he needs medication. Isn't that correct?

A: That's correct.

Dr. Alatur testified further on cross-examination:

Q: Could you state with reasonable medical probability that he would never be manic or hypo-manic again?

A: No, I cannot.

Q: Could you state with reasonable medical probability that he would take medicine regularly to control his behavior if he is, or was, in a manic or hypo-manic stage?

A: No.

Q: In fact, in your opinion, he would not take his medicine, isn't that correct?

A: He was not taking his medicine regularly when I was seeing him. However, I have not seen him in the past two years and so I don't really know what he has been doing during that period.

Q: Right. I just want to deal with what you can testify to and that is as of the end of 1983. In your opinion his prognosis was guarded, was it not?

A: Yes.

In a letter written to Saville's counsel on November 22, 1985—over three months after *Quaker Hill I* was decided—Dr. Alatur made it clear that he last saw Saville on September 28, 1983, and in his view "Mr. Saville has not been a very reliable patient in terms of staying on his medication." Moreover, while acknowledging some of the undisputed acts upon which Quaker Hill relied, Dr. Alatur also adverted to "several different incidences in (Saville's) manic state that were very unreasonable and with poor judgment and poor control of impulses."

Thus, there is insufficient evidence to establish that Saville was compliant when he applied at Quaker Hill in July 1983, two months *before* Dr. Alatur last saw him, or in April 1984, when Quaker Hill finally acted. Not only did the Commission err by focusing on medical compliance since 1982, rather than discriminatory intent, but its conclusion that there was sufficient evidence to show that Saville was rehabilitat-

ed is also not supported by substantial evidence.

Dr. Bauchwitz was unable to testify with reasonable medical certainty that Saville would not suffer a relapse into a manic or hypo-manic state. She further admitted that a person prone to relapsing into manic phases should not live in a housing complex consisting of elderly and physically handicapped individuals.

Q: [on cross-examination] Can you tell the board with reasonable medical probability that Mr. Saville will not go into a manic or hypomanic stage ever?

A: I cannot say that.

\* \* \* \* \* \*

Q: ... [C]an you testify with reasonable medical probability that Mr. Saville, if he were in a hypo-manic or manic phase, would exercise poor judgment and represent a danger?

A: He would exercise ...

Q: Without treatment?

A: Without treatment, it could be. Probably.

Q: And can you testify with reasonable medical probability that if he takes lithium that he will not represent, not at all represent, a danger to persons or property?

A: Well, I cannot be 100% assuring to you that by the fact that he takes lithium that he will be a perfect citizen all the time. And not necessarily one equal to the other but I think the lithium, in his case, would probably prevent him from reaching the point in which he loses his total judgment and he may act in a behavior which is anti-social.

Q: So, if he goes off his medication we run the risk of having him go into a manic or hypo-manic phase and out of remission. Is that correct?

A: Certainly, with any other illness, yes if you stop the medication you'll be ...

\* \* \* \* \* \*

Q: If he lapsed into a manic or hypo-manic, came out of remission, and lapsed into manic or hypo-manic phase, where he would be exercising poor judgment, would he be a suitable tenant in an elderly housing project?

A: Well, I don't think manic people when they are manic they are suited to go anywhere for that matter, neither in their own home. The only place they fit properly would be the hospital. So, therefore, anywhere he lived, if he is very manic, at that point should be hospitalized. That's the only place where they fit properly for that period of time.

Dr. Alatur opined that Saville should not live in a complex with the elderly and physically handicapped if he failed to take his medication. Dr. Alatur further noted that Saville's targets were usually authority figures, and that a landlord-tenant relationship is similar to the type of relationship that had so often triggered Saville's antisocial behavior during his past manic and hypo-manic phases:

Q: [on cross-examination] If Mr. Saville were to live in close proximity of elderly and other helpless, disabled people and did not take his medication, in your opinion, would he lapse into a manic or hypo-manic state?

A: I don't think it makes any difference where he is living, if he's not taking his medication, he may.

Q: Would he then represent a danger to persons and property because of the exercise of poor judgment, the aggressiveness, the anger and the irritability that one, that is the hallmark of a manic or hypo-manic disorder?

A: Well, his problems has not really been with ordinary people. When he is manic he gets very grandiose idea that he is the savior of the world or is going to control the postal crisis or whatever. So his targets usually are either authorities or problems of the world that he has to deal with.

Q: How about a federally funded landlord, a government agency?

A: Well ...

Q: Fit the pattern?

 \* \* \* \* \* \*

A: The problem would fit the pattern if he is being subjected to some kind of injustice that he feels that he has to deal with.

Q: How about high rent?

A: High rent may be a reason if it is high.

Q: Just like the cost of postal stamps if it's high?

A: Yes.

Q: That's all.

Q: [By Saville's counsel] As a follow-up to that, would taking medication regularly also have an effect on how he deals with something such as high rent? If he were not taking his medication regularly he might be more apt to see that as a problem as opposed to if he was taking his medication?

A: Well, as long as he is taking his medication he does not have this tendency so he usually is under reasonable control in terms of his manic episodes.

Q: That really is the key, then?

A: That's right.

### D.

■ The Commission repeatedly charged, incorrectly, that Saville was not afforded a hearing by Quaker Hill to present his side of the story. Thus, the Commission's opinion states:

> There was no consultation with a person having appropriate expertise, *nor a request for further documentation from Saville.*
>
> \* \* \* \* \* \*
>
> [Quaker Hill] decided his past behavior was socially unacceptable and afforded him *no opportunity* to show that he was currently behaving differently.
>
> \* \* \* \* \* \*
>
> [Dr. Alatur's] October 25, 1983 report to Quaker Hill about Saville's condition, including reference to "some charges for unusual behavior" could reasonably be used as a basis for requiring further information from Saville ...
>
> \* \* \* \* \* \*
>
> Saville should have been given notice of this and a *fair opportunity* to respond.
>
> \* \* \* \* \* \*
>
> At the very least, the unfavorable information must be presented to the applicant for comment. There is *no showing* that this was done here.
>
> \* \* \* \* \* \*
>
> [T]he [rejection] decision was made in an unfair way ... in failing to give Saville notice of such issues and *an opportunity to submit pertinent information.*

(Emphases added).

These statements are contradicted not only by the record, but by the Commission's own factual findings. Saville was interviewed by Quaker Hill in October, 1983, initially rejected in January, 1984, and afforded a hearing in April, 1984. *Commission Panel Decision* at 4. If that hearing was inadequate, it was so because Saville refused to be questioned about his past behavior. In disregarding this admitted circumstance, the Commission's repeated findings that Quaker Hill did not afford Saville a hearing or give him an opportunity to respond are, from the record, patently incorrect. For example, the Commission found that Saville and representatives of Quaker Hill met in October, 1983, for a personal interview:

> 8. In October 1983 Saville was routinely scheduled for a personal interview by Quaker Hill. At that time he voluntarily described some incidents of erratic behavior ...

*Commission Panel Decision* at 4.

Most notable is the Commission's factual finding that an informal hearing was held by Quaker Hill in April, 1984:

> 10. Saville was told he could have a meeting to discuss the rejection by writing Quaker Hill management in Boston. He did so by letter dated February 1, 1984. A meeting was held in early April, with the local manager and a Boston

management person in attendance for Quaker Hill. The notes of this meeting, written by the local manager (who was responsible for the January rejection of Saville's application), included reference to specific incidents and had these summary comments regarding Saville: "Told some weird stories ... Sounds crazy." Following this meeting, Saville was advised by letter dated April 19, 1984 that rejection of his application was confirmed:

My decision is based on the discussion you and I had where you spoke of certain behavior that in my determination is socially unacceptable.

I concur with my staff that it would not be appropriate for you to reside at Quaker Hill Place.

*Commission Panel Decision* at 4–5.

These findings of fact should be contrasted with the Commission's later legal conclusions, which again ignored Saville's admitted refusal to answer Quaker Hill's questions at the April 1984 hearing:

25. We believe landlords must be held responsible for at least minimal efforts to verify the information they rely upon in rejecting applicants. *At the very least, the unfavorable information must be presented to the applicant for comment. There is no showing that this was done here ...*

*Commission Panel Decision* at 15 (emphasis added).

It is most distressing to review an adjudicative order that repeatedly cites as a critical fact something which other factual findings, and the clear evidence of record, flatly refute. Recently, the Delaware Supreme Court admonished a trial court for reaching conclusions that are contradicted by the tribunal's very own findings of fact. *Virginia v. Katz*, Del.Supr., No. 216, 1986, slip op. at 11 (1987) [520 A.2d 1045 (Table)] (Walsh, J.). The same must apply with equal force to an administrative agency.

**E.**

■ The Commission also criticizes Quaker Hill for failing to adequately specify the reasons for denying Saville's applica-

tion in the original rejection letter of January 19, 1984. While that notice did not clearly state the bases for Saville's rejection, this deficiency cannot justify the Commission's order. Saville challenged the rejection, and Quaker Hill granted him a hearing where he was informed of the grounds for his rejection—his criminal and antisocial behavior—and was given an opportunity to respond. It was on this occasion that he admits he "clammed up" and refused to answer Quaker Hill's questions. Under such circumstances, the deficiences in the notice were harmless.

**VI.**

I now turn to a most serious matter which goes to the heart of any adjudicative proceeding—the imperatives of fairness and impartiality. Given the grave errors of fact and law occurring after remand, I am reluctantly compelled to address this distasteful issue because the record clearly establishes that the Commission does not understand its quasi-judicial function and the imperatives which that duty commands.

**A.**

The problem first appears to have arisen in connection with the *Quaker Hill I* appeal, when the Attorney General, through one of his principal deputies, the State Solicitor, advised the Commission by letter of January 4, 1985 that the Commission's decision was "wrong as a matter of law and was against the evidence presented." Based on that conclusion, the Attorney General refused to defend the Commission on appeal. However, he offered to make outside counsel available if the Commission requested.

The Commission's response was made by the panel chairman on January 8, 1985, not on the stationary of the Commission, but on the letterhead of his private law firm. After noting that most cases of this type proceed on appeal without the Attorney General's involvement, the panel chairman then charged that Quaker Hill had colluded with the State Solicitor and persuaded the latter to "provide extraordinary assistance

to a civil litigant." The specific accusation was that:

> The letter of January 4 gives the clear impression that the Appellant [Quaker Hill] in this case communicated with your office and persuaded [the State Solicitor] to provide extraordinary assistance to a civil litigant. The private communication is apparent from the content of the letter and the context of surrounding circumstances, and can presumably be confirmed by you ...

No factual basis whatever supports this very serious charge. Indeed, at oral argument on this appeal all counsel candidly admitted that there was no support for the panel chairman's claim.

Throughout, the tone and content of the panel chairman's January 8, 1985 letter are accusatory and acrimonious. Clearly, it is the polemic of an advocate:

> In my opinion, the January 4 letter [of the State Solicitor] *is simply out of line*, not to mention *being chillingly insensitive* to discrimination issues, *legal proprieties*, and any sense of good relations between your office and the Commission ... The *real question* about the January 4 letter is *how come it happened*, and *why was it written* without consultation with any Human Relations personnel?
>
> As you are well aware, most cases of this type proceed on appeal without any involvement of your office. Especially when two litigating parties are both represented in a hearing before an administrative body, and one appeals the administrative decision, the appeal proceeds in the Superior Court without any attention, much less involvement, from your office. *Regardless of the views of your office on this particular case, the initial question is what happened to produce the involvement.*
>
> \* \* \* \* \* \*
>
> ... With *less pontification* and more consultation, your staff could avoid this type of error.
>
> \* \* \* \* \* \*
>
> ... We have tried to show that we understand the many demands of your staff, but surely no workload burden can

explain or excuse what has happened in this case. The time for advice to the involved commissioners was at the time of the hearing and immediately thereafter, not at this late date *and not by way of a hatchet.* ...

(Emphases added).

Following a telephone conversation with the Attorney General on January 8, 1985, the panel chairman wrote a further acrimonious letter to the Attorney General on January 14. Nothing stated therein withdraws the unfounded charge of collusion, or indicates in any way that the Commissioner's charge was in error. At the outset he noted that "we are far from agreement about this matter", and resumed the fray:

> ... I would hope you would now fully appreciate how much of a shock Mr. Silverman's letter was *to us*—not only an *untimely surprise*, but a *dramatic change* in the position of your office, *from no position at all to one of abrasive antagonism.*
>
> \* \* \* \* \* \*
>
> ... [The Commissioners] are not people who are frivolous about their responsibilities, as is *implicitly accused* in the Silverman letter. Surely the Commissioners are *entitled to better treatment from your office*, and I would hope you would be willing to say so *and see that it happens.*

(Emphases added).

The Attorney General's response was dignified and direct:

> Thank you for your letter dated January 14, 1985. After reviewing this matter in more detail, I remain convinced that the opinion of the Commission is wrong and must be overturned. I cannot ignore the fact that Mr. Saville has a past criminal record even though that may not be part of the complete record. The information contained in the record is sufficient, in my opinion, to justify Quaker Hill's decision not to lease him a premise.

After this Court's *Quaker Hill I* reversal and remand in August 1985, Quaker Hill moved to recuse the chairman of the panel

for his exhibition of personal bias and prejudice, based in part on the chairman's false accusation of collusion. The chairman, with the apparent concurrence of the panel, denied the motion. At the hearing after remand, the chairman "explained" his ability to render an impartial decision, but significantly, he said nothing to correct or withdraw his baseless charges of collusion against Quaker Hill and the Attorney General:

My comment would be to emphasize that I felt all correspondence in which I was personally involved related solely to a matter of dispute with the Attorney General's Office or the Department of Justice. I don't think the merits of the case were involved and the complaints were different from anything that bears evidence as favoring one side or the other. There are always suggestions when a court or agency is reversed and the case is sent back to the same body for decision, there is always a suspicion available, if you want to be suspicious, that on the remand hearing the person or persons deciding are going to be looking for ways for deciding the same way. I don't think that's a fair suspicion. Obviously, it may be true in some cases; it's not true in all cases and I believe myself and all three Commissioners are fully able to decide this case without bias or prejudice to either party ... I have long been associated with administrative hearings and I'm rather proud that the Human Relations Commission when it could have two Commissioners here consistently tries to have three. In this case we had a split decision. And it seems to me that said that reasonable people could differ and the one party that persuaded two happened to prevail, but it means, I think, that this group of Commissioners tries to be reasonable in deciding cases before them. I happened to receive Justice Moore's decision and it was my request to the Acting Chair of the Commission that it be distributed to all members of the Commission as more or less as a textbook on a number of aspects of administrative hearings. We are an agency that has lay people hearing cases and I

don't think that there is any problem being fair or even-handed to all parties today ...

 There are several problems with all of this. First, once the Commission has rendered a quasi-judicial decision in a case before it, neither it nor its members should inject themselves in subsequent appellate proceedings without the utmost caution and propriety. In Delaware it is clear that an adjudicatory official has no cognizable personal interest before a tribunal in seeking to have his or her rulings sustained. *Wilmington Trust Co. v. Barron*, Del.Supr., 470 A.2d 257, 261 (1983). Furthermore, it is well-established that the Commission has no authority whatever to direct the Attorney General's actions in such matters. The Attorney General has complete discretion to pursue the course he deems appropriate, and the Delaware Supreme Court could not have been clearer on the subject:

Appellant further complains because the Attorney General refused to appeal the Superior Court decision to this Court, thus requiring her to retain private counsel for this final step. Her argument is a trifle muddled. The aforesaid statute, 6 *Del.C.* § 4611, does provide that on an appeal of its order to the Superior Court the Commission shall be represented by the Attorney General. The record further indicates that a *Deputy Attorney General presented the case against the present appellees* in that Court. At the same time, it must be remembered that according to the transcript before us the Commission is not one of the parties to the proceeding, but rather is the *quasi-judicial agency which rendered a decision* on the facts in the first instance. There is nothing in the Equal Rights To Housing statutes which compels the Attorney General, against his professional evaluation and judgment, to file a civil appeal in this Court simply because *either the Commission or a complainant* before the Commission feels that he should do so.

*Lindsay v. Beaver Brook Section One, Inc.,* Del.Supr., 322 A.2d 13, 14 (1974) (emphases added).

There is a salutary reason for the foregoing rule. If the Commission is to perform its quasi-judicial function with the requisite dispassion, it cannot become a partisan. That is particularly so when on a remand it will have to reconsider its prior decision without any hint or appearance of bias. When that principle is violated, as here, the Commission destroys its essential role of a fair and impartial judge of the issues and parties before it.

When an administrative hearing officer acts in a quasi-judicial capacity his conduct is measured against judicial standards. Thus, a statement made by such an official, *after* exhibiting personal bias or partiality, that he can impartially adjudicate the matter before him, is entitled to absolutely no weight. In evaluating a motion for recusal, the standard to be employed is an objective one, not the judge's subjective view of his fairness and impartiality. *Papa v. New Haven Federation of Teachers,* 186 Conn. 725, 444 A.2d 196, 206 (1982); *Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727, 732 (1983).

It is elemental that a litigant is entitled to an impartial hearing before an agency that is not biased against him. *Emerson v. Hughes,* 117 Vt. 270, 90 A.2d 910, 915 (1952). Thus, administrative officials must conduct proceedings with impartiality and proper decorum. *Hyson v. Montgomery County Council,* 242 Md. 55, 217 A.2d 578, 588 (1966). That requirement is buttressed by the further principle that any tribunal permitted by law to hear and decide cases must not only be unbiased, but must also avoid any appearance of bias. *Gardner v. Repasky,* 434 Pa. 126, 252 A.2d 704, 706 (1969). Reversal is almost a certainty when any of those precepts are ignored.

### B.

After oral argument, Saville's counsel filed a motion to supplement the record by introducing evidence allegedly relevant to the impartiality of the panel chairman. Attached thereto is a six-page letter from the chairman, dated January 29, 1987, attempting to justify his actions of two years ago. Among the claims now made by the panel chairman are that his accusations were "a confidential communication to the Attorney General regarding the lawyer-client relationship," that he "did not know what actually transpired" between Quaker Hill and the Attorney General's Office, that as chairman of the panel he "believed it was (his) prerogative, if not responsibility" to write his January 8 letter to the Attorney General, that the State Solicitor's letter of January 4, 1985 was "extraordinary and inappropriate, to say the least" and had the "appearance of a brief for Respondent, a landlord," and that the panel chairman's January 8 letter was intended to be a "confidential communication."

There is no direct acknowledgment either that his accusations were wrong or that they should have been retracted and corrected *on the record.* Instead, the panel chairman now contends, quite incorrectly, that after his January 8, 1985 telephone conversation with the Attorney General, the issue of collusion was eliminated "and it *never* was an issue thereafter" (emphasis added) and "no one ever thought, after January 8 that Quaker Hill was involved in any way whatever" with the Attorney General's position.

Unfortunately, that statement is at odds with the fact that all of these issues were placed squarely before the panel chairman in Quaker Hill's detailed motion to recuse. In denying the motion none of these new reasons were given as justification for the spurious charge of collusion. That was the time and place to have made such a record. It was not done even though the panel chairman's January 29, 1987 letter specifically stated that:

> As for recusal, the Panel considered *all that was presented by the parties* and it sought guidance as to applicable legal authorities from the then assigned deputy. The decision resulted from con-

sideration of what the deputy submitted as well as the parties' arguments. (Emphasis added).

If anything, the present explanations hardly aid the Commission's cause.

As earlier noted, administrative appeals are limited to proceedings on the record below. See 29 *Del.C.* § 10142(c), (d). The Commission and the parties had a full and fair opportunity to place all relevant matters on the record concerning the recusal, and they purported to do so. Now, they are bound by that record. *Petty v. University of Delaware*, Del.Supr., 450 A.2d 392, 396 (1982). Accordingly, the motion to supplement will be denied.

### C.

▮ In performing its duties under the Equal Rights to Housing Act, 6 *Del.C.* § 4601 *et seq.*, the Commission is statutorily compelled to act with "fairness and due process for *all parties* concerned." 6 *Del.C.* § 4602 (emphasis added). It is axiomatic that this obligation derives from the due process mandates of the Delaware Constitution. See Del. Const. art. I, §§ 7 and 9. Given the law and factual record, the chairman's intemperate correspondence with the Attorney General, asserting without foundation that Quaker Hill improperly sought extraordinary assistance from the Attorney General, cannot be justified by any standard. At the very least it connoted the appearance of bias against Quaker Hill, and given all of the Commission's actions on this record, it supports a conclusion of actual bias. The panel chairman's continued participation in this appeal was inappropriate.

### VII.

▮ The failures of the Commission in this case to adhere to essential standards of fairness and due process of law mark a sad, self-defeating day for the cause of antidiscrimination. Ignoring the clear constitutional and statutory mandates of fairness and due process, and the basic rule that its determinations be supported by substantial evidence of record, the Commission, unfortunately, has pursued an opposite course. See Del. Const. art. I, §§ 7, 9; 6 *Del.C.* § 4602; 29 *Del.C.* § 10142(d).

Regrettably, it would appear that irrespective of the law the Commission has chosen to impose its own notions upon others, and even before the issues were finally settled, to brand its critics in this case with the grave and insupportable charge that they are "chillingly insensitive to discrimination issues." Such tactics cannot pass legal muster. The Commission is a creature of law, and as such it is bound to follow the law. Without that, it impairs the foundations upon which it was established. The Commission has no charter, implied or otherwise, to achieve its ends by violating the very principles it was created to protect. Unless the Commission scrupulously adheres to standards of fairness and due process, it demeans the respect it deserves, and ultimately, its essential purpose.

By its own disregard of the law, the Commission has defeated the statutory mandates of liberal construction, 6 *Del.C.* § 4602, and that due account be taken of the agency's "experience and specialized competence." 29 *Del.C.* § 10142(d). Neither principle can legitimate impermissible acts.

I also note that the Commission, in its final order, erred in attempting to award Saville attorney fees and expert witness fees. It is well-established that such fees are not available to a prevailing litigant absent express statutory authority. *Slawik v. State*, Del.Supr., 480 A.2d 636, 639 (1984); *CM & M Group, Inc. v. Carroll*, Del.Supr., 453 A.2d 788, 795 (1982). 6 *Del.C.* Chapter 46 contains no such authorization.

In conclusion, I find that the State Human Relations Commission ignored the mandates of due process and fairness, did not correctly allocate the burden of proof of discrimination, and that its findings of fact, inferences, deductions and conclusions are not supported by substantial evidence, nor are they the product of an orderly and logical deductive process.

For the foregoing reasons, Saville's claim of handicap discrimination under 6 *Del.C.* § 4603(1) must fail. Accordingly, the final order of the State Human Relations Commission is REVERSED, and given the prior remand, Saville's complaint will be DISMISSED.