**TEXACO REFINING AND MARKETING, INC.,**
**Appellant,**

v.

**ASSESSMENT BOARD OF APPEALS OF THE CITY OF DELAWARE CITY, Appellee.**

**Civ. A. No. 88A–SE–4.**

Superior Court of Delaware,
New Castle County.

Submitted: May 1, 1989.
Decided: Aug. 15, 1989.

Donald E. Reid, of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellant.

Stephen D. M. Robinson, of Robinson & Grayson, P. A., Wilmington, for appellee.

TAYLOR, Judge.

This is a property tax assessment appeal by Texaco Refining and Marketing, Inc. [Texaco] from a determination of the Assessment Board of Appeals of the City of Delaware City [Board].

Texaco is the owner of an oil refinery in New Castle County, Delaware. A portion of the refinery known as "the dock area" is located in Delaware City, Delaware. The dock area consists of 397.16 acres of land on which are located a berm or dike, pipelines, tanks, equipment, buildings and other improvements. For the 1986 tax year, Delaware City assessed the dock area at $11,115,141. Texaco appealed this assessment to the Board. The Board upheld the assessment. Texaco paid taxes on this assessment under protest and filed an appeal

with this Court. While this appeal was pending, Delaware City assessed this same property at $20,000,000 for the 1987 tax year. Texaco sought to appeal this new assessment to the Board.

Prior to this Court's determination on the 1986 assessment and the Board's determination of the 1987 assessment, Texaco and Delaware City entered into an agreement whereby a Mr. Arnold Goldsborough would reassess the property and the new appraisal would apply to both the 1986 and 1987 tax years. The agreement specified what property was subject to appraisal and permitted Texaco to conduct its own assessment. If Texaco was not satisfied with the result of Goldsborough's assessment, it could appeal that assessment to the Board.

Mr. Goldsborough was unable to complete the assessment of the property. Delaware City then hired Mr. Thomas Reynolds to conduct the assessment. Mr. Reynolds appraised the dock area at $36,149,000. Texaco appealed this assessment to the Board. By agreement, the appeal covered the tax years 1986, 1987 and 1988. The Board modified the Reynolds assessment and valued the dock area at $29,876,371. Texaco now appeals the Board's decision. Both sides have submitted briefs.

On an appeal from a determination of the Board,

> [t]he decision of the Board shall be *prima facie* correct and the burden of proof shall be on the appellant to show that the Board acted contrary to law, fraudulently, arbitrarily, or capriciously.... The Court may affirm, reverse or modify the Board and the decision of the Court shall be final.

66 *Del. Laws* Ch. 165 (1987).

A tax assessment appeal to the Board is governed by Section 4–01 D of the Delaware City Charter, which provides:

> Each year, at least 30 days before the beginning of the tax year, the Mayor and Council shall hold a Board of Appeals ... during which time the Mayor and Council acting as such Board shall hear and determine appeals from assessments and shall make such corrections and additions

as may be deemed necessary and proper ...

61 *Del. Laws* Ch. 251 (1978). The Board hearing on Texaco's appeal was on May 25, 1988. The Board members who participated in that hearing were Mayor Evert R. Brown and Council members Patricia M. Harrison, Henry E. Nickle, Robert L. Haugh and Katherine Wisowaty.

Subsequent to the May 25, 1988 hearing, the City's assessor, Reynolds, wrote a letter to the Board supplementing portions of his appraisal. On August 22, 1988, an additional hearing was held to give Texaco the opportunity to cross-examine Reynolds on this new information and to present additional evidence. Sometime prior to the August 22, 1988 hearing Mayor Brown died. The Board members who participated in the August 22, 1988 hearing were Mayor Patricia M. Harrison and Council members Henry E. Nickle, Robert L. Haugh and Anna E. Brown.

The Board published its decision establishing the property assessment at $29,876,-371 on October 25, 1988. The decision of the Board was made by Mayor Patricia M. Harrison, Henry E. Nickle and Anna E. Brown. Robert L. Haugh, who had attended both hearings, dissented. Two members of the Board did not participate in the decision.

## I.

Texaco contends that the decision is invalid for a number of reasons. The applicable provision of the Delaware City Charter is Section 4–01 D, which provides that "[t]he decision of a majority of the Mayor and Council sitting on appeals shall constitute the final decision of the Assessment Board of Appeals." 66 *Del. Laws* Ch. 165 (1987).

### A.

Texaco argues that the quoted Charter language requires the Mayor and all five members of Council to sit as the Board to decide appeals.

Texaco cites *J. Ehrlich Realty Co. v. Dover*, 36 Del. Ch. 28, 124 A.2d 732 (1956),

for the proposition that Charter language such as the Delaware City Charter language requires that the entire Board must sit to hear appeals. The City of Dover Charter, which was involved in that case, provided that the Council would constitute the Board to hear assessment appeals. In *J. Ehrlich Realty Co.* only a Council committee held the hearing although the entire Council decided the appeal. Applying the provision of the Dover Charter which required the Dover Council to sit to correct and revise the posted assessment and "to hear appeals", Chancellor Seitz held:

> As I interpret the charter, when a taxpayer desires to appeal he is entitled to have his appeal heard as well as determined by the Board. I therefore agree with plaintiff that the appeal hearings ... did not comply with the charter because they were conducted by a committee of the Board. (Footnote Omitted.)

124 A.2d at 738. The conclusion from *J. Ehrlich Realty Co.* is that the statutory hearing must be conducted by all members who make the final decision.

The language of the Delaware City Charter requires the Board of Appeals (consisting of the Mayor and Council) to "hear and determine appeals". Therefore, the hearing requirement applied in *J. Ehrlich Realty Co.*, namely, that those who participated in deciding the appeal must have heard the appeal, would also apply here.

This conclusion does not address Texaco's contention that the Delaware City Charter provision required the entire Board, consisting of the Mayor and all five Council members, to hear the appeal. Chancellor Seitz was not called upon to consider whether less thant the full membership could hear and decide the appeal because in that case the total membership of the Board decided the appeal.

■ The Delaware City Charter requires a "decision of a majority of the Mayor and Council sitting on appeals ... [to] constitute the final decision of the Assessment Board of Appeals." I conclude that the presence of the words "sitting on appeal" in the Delaware City Charter permits less than the Board's full membership to hear

and decide an appeal, provided at least a quorum conducted the hearing. *See Melandrino v. Violent Crimes Compensation Board,* Del. Supr., C.A. No. 85A–JN–15, O'Hara, J. (Letter Opinion), 1987 WL 8669 (February 10, 1987).

## B.

A further Texaco contention is that a valid decision by the Board must be the affirmative decision of a majority of the whole Board.

The Supreme Court of the United States has recognized that absent a contrary statutory provision, "[t]he almost universally accepted common-law rule is ... that ... a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body." *Federal Trade Commission v. Flotill Products, Inc.,* 389 U.S. 179, 183, 88 S.Ct. 401, 404, 19 L.Ed.2d 398, 402 (1967) (Footnote omitted). *See also Morgan v. Saslaff,* 123 N.J.Super. 35, 301 A.2d 456, 457 (1973). *But cf. Commonwealth ex. rel. Bagnoni v. Klemm,* 499 Pa. 566, 454 A.2d 531, 532 (1982).

Sections 3–14 of the Delaware City Charter provides:

> [a] majority of the members of the Council shall constitute a quorum to do business. No ordinance shall be valid unless it shall have the affirmative vote of a majority of all the members of the Council. Resolutions, orders and motions shall be valid upon the affirmative vote of a majority of the members of Council present ...

61 *Del. Laws* Ch. 251 (1978).

■ The first sentence of the quoted provision is consistent with the generally accepted quorum standard. *Federal Trade Commission, supra.* That language is not literally applicable to the Board because it includes not only the Council but also the Mayor. A quorum of the Board consists of four of the six members of the Board. The remainder of the above quoted provision does not apply to the Board because the provision relates to the Council when performing legislative functions. *J. Ehrlich Realty Co. v. Dover, supra.* While the

levying of taxes is a legislative function, the decision of an appeal relating to the application of that tax to an individual taxpayer is an administrative function. *Palmer v. McMahon*, 133 U.S. 660, 669, 10 S.Ct. 324, 327, 33 L.Ed. 772 (1890).

Applying the principles discussed above, where a majority of the Board is present, the affirmative vote of a majority of the members present would constitute a valid decision of the Board.

### C.

For reasons discussed later in this Opinion, it is unnecessary to discuss the issues growing out of the death of the Mayor, the selection of a councilperson as Mayor, and the filling of the Council vacancy after the first hearing.

### II.

■ Texaco also argues that it was denied a fair hearing because the questioning of its witnesses by certain Board members amounted to "hostile" cross-examination, evidencing the Board's bias against Texaco. Members of an administrative board may question witnesses appearing before the board, provided that the questioning is not argumentative and is not done in such a manner as to breach its duty as a neutral, detached and impartial decision maker. *Stoltz v. Delaware Real Estate Commission*, Del. Super., 473 A.2d 1258, 1265 (1984). Having reviewed the portions of the transcript identified by Texaco as containing the alleged hostile cross-examination, the Court finds that the questioning by the Board was not argumentative or in breach of the Board's duty to remain a neutral, detached and impartial decision maker. Therefore, Texaco was not denied due process because of the questioning of its witnesses by the Board.

### III.

■ Texaco also argues that it did not receive a fair hearing before the Board because Delaware City's counsel simultaneously represented the City and the Board. The City Solicitor conducted the direct examination of the City's witnesses and both he and the Board's retained attorney cross-examined Texaco's witnesses. In addition to the City Solicitor's representing the City as an advocate before the Board, both the City Solicitor and the Board's retained attorney advised and assisted the Board on legal matters which arose during the Texaco appeal proceeding. This legal assistance is evident throughout the transcripts of the hearings. As such, the attorneys acted in both an adversarial and an advisory capacity during the proceedings.

■ Delaware City's counsels' dual role is not disputed by the Board. It is the Board's position that "to suggest that the City Solicitor is not permitted to advise the Board with respect to matters considered during the sessions, or legal matters pertaining to the hearings themselves, is simply an apparent grasp at the last straw ..." The issue, therefore, is whether the commingling of the adversarial and advisory functions by the attorneys denied Texaco of a fair hearing before the Board.

The Delaware Supreme Court has held that

> [i]t is incumbent upon the government in the exercise of its taxing authority to ensure the utmost fairness in the appraisal process. Citizens either individually or as legal corporate entities must be accorded a full and fair hearing wherein they are given full recourse to air their evidence and rebut the assessment rolls.

*Delaware Racing Association v. McMahon*, Del. Supr., 340 A.2d 837, 844 (1975). *Cf. Formosa Plastics Corp. v. Wilson*, Del. Supr., 504 A.2d 1083, 1089 (1986). A body permitted to make administrative decisions must act with impartiality and must avoid the appearance of bias. *Quaker Hill Place v. Saville*, Del. Super., 523 A.2d 947 (1987), *aff'd. on other grounds*, Del. Supr., 531 A.2d 201 (1987). Where the procedure before a board is such that a property owner is denied a full and fair hearing, this Court will overturn the decision of the board and remand the case back for a hearing consistent with the requirements of due process. *See O'Neill v. Board of Assessment Review of New Castle County*, Del. Super.,

C.A. No. 85A–MY–16, Martin, J. (Letter Opinion), 1986 WL 14018 (November 21, 1986).

Whether the commingling of adversarial and advisory functions before an administrative board operates to deny a party due process is a matter of first impression in this State. This issue was addressed by the Supreme Court of Pennsylvania in *Horn v. Hilltown*, 461 Pa. 745, 337 A.2d 858 (1975).

In *Horn*, the same solicitor served as advisor to the zoning hearing board which heard an appeal and also represented the township in opposing the appellant's position on the appeal with respect to appellant's application for a zoning license. The Pennsylvania Supreme Court concluded that

> While no prejudice has been shown by this conflict of interest, it is our opinion that such a procedure is susceptible to prejudice and, therefore, must be prohibited.

*Id.* See also *Roche v. Commonwealth State Board of Funeral Directors*, 63 Pa. Cmwlth. 128, 437 A.2d 797 (1981); *Commonwealth, Department of State v. Chairman*, 31 Pa.Cmwlth. 615, 377 A.2d 1022 (1977).

This Court notes that Section 7–01 of the Delaware City Charter provides:

> It shall be the duty of the City Solicitor to give legal advice to the Mayor and ·Council, the City Manager, department heads and other officers of the City, and to all City departments, offices or agencies; he/she shall represent the City in all legal proceedings and shall perform such other legal services as may be required by the Mayor, Council, City Manager, this Charter, law or ordinance.

61 *Del. Laws* Ch. 251 (1978). This Section requires the City Solicitor to represent the City in any legal proceedings, and also requires the City Solicitor to give legal advice to the Mayor and Council. In most instances, the City Solicitor can perform these tasks without conflict where the City and the Mayor and Council are performing their normal executive or legislative functions. Here, the Mayor and Council are acting as an appeal Board, and not performing executive or legislative functions. Its function is to determine whether the property assessment made by the City's Assessor is fair and proper and in accordance with law in the light of the valuation facts relied on by the Assessor and valuation facts presented by the City and the property owner. As such, they must disassociate themselves from advocacy on behalf of the City. When serving as the Board, the members must put aside the fact that the City would benefit from a higher assessment and must act in an impartial and unbiased manner and be governed by the evidence presented. The legal adviser to the Board must meet the same standard. He cannot act as advocate for the Assessor if he also acts as adviser to the Board or confers with the Board. These same restrictions apply to any attorney hired by the City or the Board in connection with assessment appeal proceedings. That is not to say that the City may not properly pursue its position by an attorney or by City employees other than the Board. Clearly, the assessment department or other agency of the City may personally or by an attorney present evidence supporting the City's assessment position. However, the attorney who performs that function may not also act as advisor to the Board.

The record of the Board's hearings which are before this Court shows that the City Solicitor and the retained attorney did not adhere to the standards set forth above. The adversarial and advisory functions clearly were commingled and violated principles of due process. Therefore, the Board's hearing and decision are tainted and must be set aside.

Texaco also contends that the fact that the Board and its City Solicitor, prior to the rendering of the Board's decision, entered into a contingency fee agreement relating to his services to be rendered in connection with the anticipated appeal proceeding in this Court was a further violation of due process. This is denied by the Board. Since a new assessment appeal hearing is

required, it is not necessary to pursue this issue further.

The Court notes that it would not appear to violate due process principles for the advocate acting pursuant to a contingency fee agreement to pursue the City's position before this Court in an assessment appeal proceeding. Clearly, an advisor to the Board could not have contracted or have an expectation to contract to represent the City or the Board in subsequent Court appeal proceedings on a contingency fee basis. The Court's silence with respect to non-contingency representation by that attorney does not carry the implication that it would be ethically permissible.

## IV.

In addition to the above due process challenges, Texaco has raised several substantive challenges to the Board's decision. By way of guidance, the Court will address several of these substantive issues.

### A.

■ In order to maintain the shipdocking facility, it was necessary for Texaco to periodically dredge the water channels leading to the docking area. The dredging material was then deposited in a particular location. Over time, this material has formed a berm or dike, which the City sought to assess as an improvement.

Texaco contends that the assessment was limited by agreement between Texaco and Delaware City which specified what property was subject to assessment and the berm was not included in that agreement. The agreement does not support Texaco's position because it provides for the assessment of "such other property as may be properly assessed pursuant to the Delaware City Charter and the laws of the State of Delaware." Any inconsistency between the agreement and the law must be controlled by the law.

9 *Del. C.* § 8101(b) provides that for purposes of taxation real property consists of land, buildings, improvements and special betterments. "Improvements" is defined as "annexations to land other than build-

ings which increase the market value of the land when used for general purposes permitted by law, ..." 9 *Del. C.* § 8101(c). Limited taxation of annexations or other additions to land is provided by subsection (d) of § 8101 of the type enumerated in subsection (e). The berm is not included in subsection (e). Therefore, the berm is taxable only if it is treated as a part of the land and it falls within subsection (c).

The berm apparently is a dike or raised border surrounding a settling area into which material and water are deposited as they are dredged from the river bottom in reestablishing the ship channel leading to the Texaco dock. When the solid material settles out of the water, the water is drained back into the river and the solid material after the water remains.

To be taxable as an improvement the berm (1) must be an annexation to land, (2) must increase the value of the land, and (3) must be used for general purposes permitted by law. These are facts to be addressed at the subsequent hearing.

■ The fact that the berm had not been subject to a separate assessment prior to 1988 does not preclude the City from now applying an assessment to the berm if the evidence shows that the requirements of § 8101(c) are met.

### B.

■ Next, Texaco argues that the Board should not have included the pipelines and tanks in the dock area in the assessment. Since pipelines and tanks were not specifically enumerated in the agreement as taxable items, they are subject to taxation only if they "may be properly assessed pursuant to the Delaware City Charter or the laws of the State of Delaware". For the reasons discussed above in part IV A of this Opinion, the agreement does not preclude assessment if the items qualify under that language.

9 *Del. C.* § 8101(e) provides for the taxation of various types of industrial and commercial components as "special betterments". Within this subsection, designa-

tions (2) and (5) list the following items as assessable real property:

(2) Mains, pipes, and tanks, used for conducting steam, heat, water, oil or gas, not used in a manufacturing, assembling, *processing or refining operation.*

(5) Storage tanks.

If mains, pipes or tanks are "used in a manufacturing, assembling, processing or refining operation", they are not subject to taxation. 9 *Del. C.* § 8101(e)(2).

The first consideration focuses on the phrase "used in a manufacturing, assembling, processing or refining operation". This language could be construed to apply to all such items located at the facility or could be limited to those items which are used as a part of performance of the actual process. The word "operation" generally refers to the function at the facility and not to the facility itself. It will be noted that the statute refers to "refining operation". "Refining" normally connotes a function, while "refinery" usually refers to the facility. If the draftsman had intended to refer to the facility rather than to the function, the proper reference would have been "refinery". I conclude that the "operation" in the case of a refinery is essentially the separation or conversion of raw petroleum material into more useable fuels and petrochemicals. Hence, it is the mains, pipes and tanks which played a part in the refining process or operation which are non-assessable. The requisites of the law applied to the record will be the determinant at the rehearing.

### C.

At the previous hearings, Henry E. Lloyd, Jr., Texaco's expert in charge of supervising the area where the pipes were located, testified that the pipelines at the dock area are divided into two types, the crude oil line, which is used to transfer raw crude from barges to the refinery, and the product lines, which are used to transport the finished product back to the dock area.

The Board assessed all the pipelines, finding that "the testimony of Mr. Lloyd makes clear that no refining takes place in the pipelines themselves". The Board held that the purpose of the pipelines was for transporting either raw crude from the dock area to the refinery, or the finished product back to the dock area, and concluded that "in either case, the pipelines cannot be considered part of the refining operation".

Texaco argues that this Court has held that the crude oil line and the product lines were not subject to assessment. *Getty Refining and Marketing Co. v. Leavy*, Del. Super., C.A. No. 81A–MR–25, O'Hara, J. (Letter Opinion) (September 9, 1982). In *Leavy*, which involved essentially the same property, this Court reversed an assessment of pipelines where the only qualified expert testimony before the County Board of Assessment Review was that the pipelines in the area were used in the refining operation. That decision does not preclude appropriate contrary testimony in another proceeding and a contrary result, if warranted by the evidence. The Court in *Leavy* did not undertake to interpret 9 *Del. C.* § 8101 as a matter of law, but merely found that the Board had arbitrarily found pipelines to be assessable contrary to the only testimony in the record.

According to Texaco's expert, Henry Lloyd, the crude oil coming from the tanker contains salt water, and the first step in converting the oil from crude to refined product is to remove the water and salt. The water removal process was commenced in the pipeline which fed the refinery by injecting an emulsifier into the crude oil. His testimony would support the conclusion that from the point where the injection of the emulsifier into the crude occurred, the pipeline was being "used in a manufacturing, ..., processing or refining operation", *cf.* 9 *Del.C.* § 8101(e)(2), and hence was not subject to assessment.

The City's appraiser did not dispute the testimony of Texaco's expert concerning the function performed by the pipelines described above.

The record also considers pipelines whose function is to convey completely refined petroleum product from the refinery. If that fact is accepted by the Board, the pipe

would not be exempt from assessment under the standard discussed above.

### D.

Turning to the assessment of the tanks located in the docking area, the evidence at the Board's hearings is that there are two tanks located on this land—a ballast water tank and a wet oil tank. According to Mr. Lloyd, the ballast water tank is used to collect ballast water removed from the barges and ships which bring crude oil to the Texaco pier. The ballast water is mostly water, but contains a small amount of crude oil. While standing in the ballast water tank, the oil separates from the water. This oil is then transferred to the wet oil tank, from which it is periodically mixed with the crude oil discussed above. The water remaining in the ballast water tank is then treated and then discharged into the Delaware river. Texaco's appraiser testified that the tanks were part of the refining process. Mr. Lloyd testified that these tanks are not used for "storage", but are used for "temporary impoundment". Since there appears to be no distinction between storage and impoundment, the basis of Mr. Lloyd's differential is between temporary storage and non-temporary storage. The witness did not offer support for that differentiation. Clearly, storage does not require permanency. The length of time which the oily water remains in the ballast water tank to permit the water to separate from the oil is not stated.

The Court need not address Texaco's other arguments.

Because Delaware City's Counsel simultaneously represented the City and the Board, Texaco was denied a fair hearing on its property assessment. Accordingly, the decision of the Board is REVERSED and the case is REMANDED for a new hearing.